2022 IL App (1st) 182542

FIRST DISTRICT
SIXTH DIVISION
April 15, 2022

No. 1-18-2542

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 8773 |
| | ) | |
| PRINCE PATTERSON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant, Prince Patterson, appeals his armed habitual criminal conviction after a bench trial. On appeal, defendant contends (1) his conviction should be reversed where the State did not prove beyond a reasonable doubt that he possessed a firearm and (2) the cause should be remanded for further proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), where defendant's allegation that trial counsel failed to investigate multiple witnesses was sufficient to establish counsel's possible neglect of his case. For the following reasons, we affirm.

¶ 2                                I. JURISDICTION

¶ 3     The trial court sentenced defendant on October 30, 2018. Defendant filed a notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                    II. BACKGROUND

¶ 5     Defendant was arrested after police officers observed him standing next to a parked vehicle and placing a gun through the open window on the driver's side. He was charged by indictment of being an armed habitual criminal (count I), unlawful use or possession of a weapon by a felon (counts II and III), aggravated unlawful use of a weapon (counts IV-VII), and defacing identification marks of firearms (count VIII).

¶ 6     At defendant's bench trial, Officer Patrick Graney testified that on May 26, 2017, he was one of six officers riding in an unmarked van on North Central Park Avenue in Chicago. A lot of people were out because it was Memorial Day weekend. Around 10:53 p.m., the van approached a group of five to six people standing outside a Dodge Charger. Officer Graney, who sat in the backseat passenger's side of the van, identified defendant as one of these individuals. Defendant was standing on the street directly next to the driver's side of the Charger.

¶ 7     From his seat in the van, Officer Graney saw defendant remove a two-tone firearm from his waistband and place it in the driver's side window, which was one-quarter to halfway down. Officer Graney was 5 to 10 feet away from defendant at the time, and nothing stood between him and defendant when he saw defendant put the gun inside the vehicle. Artificial lights on the street also illuminated the area. He detained defendant, who was placed into custody.

¶ 8     Officer Graney then observed Officer Catalano[1] approach the Dodge Charger and recover a Bersa Thunder .380 two-tone firearm from the floor on the driver's side. He was about 5 to 10 feet away when Officer Catalano recovered the gun. Officer Catalano recovered a second firearm from under the driver's seat. He showed the guns to Officer Graney and defendant. Officer Graney read defendant his *Miranda* rights approximately 10 minutes after officers arrived on scene. See

---

[1]Officer Catalano testified at trial, but his first name does not appear in the record.

*Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant stated that he understood and that the firearms belonged to him. He said the area was in a bad neighborhood and he wanted to sell the firearms.

¶ 9 On cross-examination, defense counsel asked Officer Graney how much of the firearm he could see in defendant's hand. He responded, "A majority of it to know it was a firearm." Officer Graney acknowledged that defendant's statement was not memorialized in writing or videotaped.

¶ 10 Officer Catalano testified that on May 26, 2017, around 10:54 p.m., he was driving an unmarked van down North Central Park Avenue. Five other officers were riding with him. Officer Graney, who was sitting in the back of the van, then said, "[G]et out of the car. That guy just put a gun through that window and dropped it." Officer Catalano stopped and exited the van. He saw defendant standing in the street next to the driver's side of the Charger. The window was open, and defendant was within "arm's reach" of the vehicle.

¶ 11 Officer Catalano testified that he approached the vehicle because Officer Graney saw a gun and he wanted to ensure the officers' safety. He explained, "When I got to the window, I could clearly see a two-tone firearm, the back of the firearm and the grip protruding from underneath the seat, so I tell the female sitting in the driver's seat, don't move. I opened the door and I recovered that firearm." The assistant state's attorney then asked:

> "Q. And why do you tell her not to move?
>
> A. For our safety that she doesn't make a movement toward the gun.
>
> Q. And you are able to recover that firearm?
>
> A. Yes.
>
> Q. After recovering that firearm, what do you do next?
>
> A. I ask her to step out of the vehicle. She steps out of the vehicle and I look back underneath the seat and that's when I find another semiautomatic pistol.
>
> Q. And is that under the driver's seat?

A. Yes.

Q. And after recovering those firearms, what do you do with those firearms?

A. I cleared them. There was one round in the chamber of each as well as rounds in the magazine, so I made those two firearms safe, then I notified the other officers that we— two guns were recovered.

Q. And how did you notify other officers?

A. I showed them the guns."

¶ 12　　After showing Officer Graney the recovered guns, Officer Catalano observed Officer Graney Mirandized defendant from a preprinted source. Defendant then stated that "they were his guns and he was in the area to sell them because it was a dangerous area." Defendant was placed into custody. Officer Catalano handed the guns to Officer Metchy,[2] who inventoried them. The firearms were sent to Illinois State Police crime lab, but defendant's fingerprints were not recovered from them.

¶ 13　　On cross-examination, Officer Catalano testified that he "ran" the license plate of the vehicle but did not recall obtaining a Firearm Owners Identification card (FOID card) from the vehicle. He was shown a FOID card, which he stated had the name "Reginald Robinson" on it. Officer Catalano had not seen the FOID card before. He acknowledged that he did not see defendant place a gun in the Dodge Charger. He stated that the door of the Charger was closed but that the window on the driver's side was down. He was "quite a bit taller than the vehicle" so he could look "right down through the window." Officer Catalano testified that after he recovered the first firearm, the driver exited the vehicle. Defense counsel continued:

---

[2]Officer Metchy's first name does not appear in the record.

"Q. So you recovered the firearm while the driver was still sitting in that vehicle, correct?

A. Yes.

Q. So you essentially had to go under her legs to obtain the firearm; is that correct?

A. After opening the door, correct.

Q. And is that when you were able to see then there was a second gun under that same seat?

A. No.

Q. So you were able to notice the second gun after the driver was outside and you conducted a further search of the vehicle, correct?

A. Correct."

¶ 14    The State entered Defendant's certified statements of conviction in case Nos. 12 CR 02429 and 0123546-01 into evidence and then rested its case-in-chief.

¶ 15    Defendant's counsel moved for a directed finding. Regarding count VIII, defacing identification marks on a firearm, he argued that police recovered a 9mm gun under the driver's seat of a vehicle that defendant was not found in and that someone else was sitting in that vehicle. Counsel argued that the evidence did not "show any kind of constructive possession regarding that particular count and regarding the other counts." The trial court denied defendant's motion.

¶ 16    The defense called Shamone Pickens as a witness. She testified that on May 26, 2017, at 11 p.m., she drove to Chicago and North Central Park Avenue in a Dodge Charger owned by her godfather, Reginald Roberson.[3] She was on her way to see a friend. A white police van passed her, and she heard the officers in the van talking to people on the street. The van reversed, and four to

_____

[3]Roberson is sometimes referred to as "Reginal" or "Robberson" in the record. His FOID card lists his name as "Reginald Roberson."

six police officers jumped out of the van. Everyone in the street began to run, but the police "stopped" defendant.

¶ 17    Pickens testified that no one came to her or put a gun in her vehicle. She stated that officers approached her vehicle, asked her to exit, and then searched it. She told them that the vehicle belonged to her "goddad." When asked whether she saw the police take anything from the Dodge Charger, Pickens answered, "Just the papers." On cross-examination, Pickens reiterated that police only took papers from the car and denied they recovered a gun that defendant had put into the car. Pickens denied that defendant was her boyfriend but admitted having seen him in the neighborhood.

¶ 18    Defendant testified on his own behalf. On May 26, 2017, he lived at 839 North Central Park Avenue. That night, at 11 p.m., he and his cousin Michael Carter went outside the front of the house to smoke a cigarette. Many people were out that evening. A white van with tinted windows "rolled up," and a passenger of the van asked Carter if they had any "blows." Carter told him "no, we don't sell drugs out here." The passenger said, "[C]ome on, we not the police, I just want some drugs to get high." Carter replied, "[W]e don't sell drugs right here, not on this block, man, go down there somewhere."

¶ 19    Defendant testified that the driver and four passengers then "jumped out of the car and people got to running." The police chased them, and the "passenger officer" fell into a puddle of water. Defendant laughed and took out his phone. He was about to press the record button when the driver and a passenger grabbed him, threw down his phone, and "put handcuffs on us." After putting handcuffs on defendant and many others, the officers took their identification, wrote down their names, and ran name checks. Defendant saw the officers search the Charger, but he did not see them recover any guns from the vehicle. He testified that he did not have a gun on him and that he did not place a gun inside the Charger. After the officer ran their names, they "came back clear."

Officer Catalano then said that defendant was on parole and "well, take him for having gang contact as of right now." Defendant was placed into custody.

¶ 20    Defendant denied telling police that he was in a bad area or that he was trying to sell guns. He testified that he would not make such a statement because he is a convicted felon and did not want to take himself away from his children. He knew he was not supposed to possess firearms.

¶ 21    On cross-examination, defendant testified that, when he was in front of his grandmother's house that evening, the white van pulled up "down the road," three houses down. He saw several police officers get out of the van at that location. After defendant recorded the officer fall, "we walked just a couple houses over, guys ran past us, guys ran everywhere. They handcuffed everyone that didn't run really." He stated that the police "went into three vehicles" and after they went into "that vehicle," he was placed into custody. After defendant testified, the defense rested.

¶ 22    In rebuttal and for purposes of impeachment, the State offered that in 2012, defendant was convicted of unlawful use of a weapon by a felon and aggravated unlawful use of a weapon. Both counts were merged, and defendant was sentenced to 10 years' imprisonment.

¶ 23    In closing, defense counsel argued that the officers' testimony was not credible. He pointed out that Officer Graney was the only officer who "supposedly" saw defendant place the firearm inside the Charger and that Officer Catalano, who was driving the van, did not see it. Counsel further argued that it was unlikely Officer Catalano could see a gun sticking out from under the driver's seat as he approached the vehicle and looked through the window, because "someone is sitting in the seat." He continued, "The reason why I bring that up is because I think there was a search of this vehicle and other vehicles done and yes, firearms were recovered, but I believe this defendant had nothing to do with that and didn't put any firearms in the vehicle." Counsel also argued that the officers' testimony that defendant admitted to selling guns in the area was not credible.

¶ 24    The trial court found defendant guilty of all charges. The court stated:

> "The Court has heard the evidence in this case and there are two different versions
> of events. The only thing really overlapping is that [defendant] agrees that he was at the
> scene where this incident took place.

> I listened carefully to the evidence. I do find the police in this case to be far more
> credible than [defendant], credible and compelling beyond a reasonable doubt. I don't find
> [defendant] compelling. There will be a finding of guilty as charged."

The court stated that all counts merged into count I, the armed habitual criminal charge.

¶ 25    Defense counsel filed a motion for a new trial. At the hearing on the motion, counsel argued that Officer Graney's testimony that he saw a firearm in defendant's hand was not credible, nor was Officer Catalano's testimony that he could see the gun from under the driver's seat. Counsel argued that, because defendant was a convicted felon and because of his experience in the criminal justice system, he would not have admitted to selling guns in the area. Defendant was aware that making such an admission would "guarantee him basically a trip to the penitentiary." The trial court denied the motion, explaining:

> "The matters you bring to my attention posttrial are exactly the matters that you brought
> to my attention at the time of the trial. Credibility of the officers was a primary issue. There was
> a sighting of the gun, a gun recovered, and a statement by your client. I found those to be credible
> and compelling beyond a reasonable doubt."

¶ 26    The trial court then addressed defendant's *pro se* posttrial motion alleging ineffective assistance of counsel. Details of defendant's motion and the trial court's preliminary *Krankel* hearing are set forth in our examination of defendant's *Krankel* issue below. After a preliminary hearing, the trial court denied the motion. The court subsequently held a sentencing hearing and sentenced defendant under count I to the minimum sentence of six years' imprisonment, followed by three years of mandatory supervised release.

¶ 27    Defendant filed this appeal.

¶ 28                                III. ANALYSIS

¶ 29    Defendant first argues that his armed habitual criminal conviction should be reversed because the evidence at trial did not show, beyond a reasonable doubt, that he possessed a firearm. On a challenge to the sufficiency of the evidence, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not the function of this court to retry defendant. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). Rather, it is for the trial judge, as the trier of fact in a bench trial, to determine the credibility of witnesses, weigh the evidence and draw reasonable inferences therefrom, and resolve any conflicts in the evidence. *People v. McDonald*, 168 Ill. 2d 420, 448-49 (1995). Defendant's conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 30    To convict defendant of the offense of being an armed habitual criminal, the State must prove, in pertinent part, that he possessed a firearm after being convicted of two or more enumerated offenses. See 720 ILCS 5/24-1.7(a) (West 2018). On appeal, defendant challenges only the sufficiency of the evidence proving his possession of a firearm.

¶ 31    To prove the possession element, the State can show either actual or constructive possession of a firearm. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. Actual possession is shown by testimony that defendant had some form of control over the firearm, "such as he had it on his person, tried to conceal it, or was seen to discard it." *Id.* Officer Graney testified that he saw defendant pull a two-tone

firearm from his waistband and place it into the driver's side window of the Dodge Charger. He then observed Officer Catalano recover a two-tone Bersa Thunder .380 firearm from the vehicle. This testimony supports a finding that defendant actually possessed a firearm. See *id.* ¶ 28 (finding the credible testimony of police that showed defendant had actual possession of a firearm was sufficient to prove defendant's possession of a firearm).

¶ 32    Defendant argues, however, that the officers' testimony was not credible. He contends that Officer Catalano could not possibly see the guns under the driver's seat of the Dodge Charger with Pickens sitting in the seat. It is also improbable that defendant would have told officers the guns belonged to him because he is a convicted felon and knew he should not have a firearm. Defendant asserts that his testimony and Pickens's testimony, both of which contradicted the officers' account of the incident, were more credible. Both testified that defendant was not near the Dodge Charger that night, nor did he pass a firearm through the driver's side window of the vehicle.

¶ 33    We disagree. It is the trial court's responsibility as trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom. *People v. Bradford*, 2016 IL 118674, ¶ 12. It is well established that the testimony of a single witness, if positive and credible, is sufficient to convict even if it is contradicted by defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). "Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *People v. Gray*, 2017 IL 120958, ¶ 36. Eyewitness testimony is insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 34   The trial court acknowledged that "there are two different versions of events. The only thing really overlapping is that [defendant] agrees that he was at the scene where this incident took place." However, the court found "the police in this case to be far more credible than [defendant], credible and compelling beyond a reasonable doubt. I don't find [defendant] compelling." As factfinder, the trial court is in a superior position to assess the credibility of witnesses, resolve inconsistencies, determine the weight to assign the testimony, and draw reasonable inferences therefrom. *People v. Jackson*, 358 Ill. App. 3d 927, 941 (2005). Although defendant and Pickens presented testimony that contradicted the officers' testimony, such testimony does not compel a finding that no reasonable person could accept Officer Graney's testimony that defendant possessed a firearm beyond a reasonable doubt. See *Siguenza-Brito*, 235 Ill. 2d at 228 (asserting that a conviction will not be reversed simply because the evidence is contradictory or because defendant claims that the State's witnesses were not credible).

¶ 35   Defendant also contends that the State failed to prove he possessed a firearm as defined by the Firearm Owners Identification Card Act (FOID Act) (430 ILCS 65/1.1 (West 2018)). For purposes of the armed habitual criminal offense, "firearm" is defined by section 1.1 of the FOID Act, which provides that a firearm is " 'any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas.' " *People v. Wright*, 2017 IL 119561, ¶ 71 (quoting 430 ILCS 65/1.1 (West 2010)). The provision specifically excludes items such as certain pneumatic guns, spring guns, paint ball guns, and BB guns. *Id.*

¶ 36   Defendant argues that, although Officer Graney said he saw defendant with a two-tone gun, he did not actually handle the gun and thus could not know whether it was real or a fake. He characterizes Officer Graney's testimony as "conclusory" and "vague" and asserts that "[n]othing about Graney's testimony establishes that it was an object capable of expelling a projectile and not a facsimile made to

11

look like a .380 Bersa Thunder." Additionally, the State did not produce the firearm at trial. Defendant asserts that detailed evidence of a gun's characteristics is required in order to prove it was a dangerous weapon, citing *People v. Ross*, 229 Ill. 2d 255 (2008).

¶ 37    In *Ross*, the victim testified that the defendant had pointed a gun at him and then demanded his wallet. *Id.* at 258. He described the gun as " 'a black, very portable gun' " which was small and " 'something you can conceal.' " *Id.* Officers drove the victim to the scene of the crime soon after it occurred, and the victim saw the defendant and identified him as the offender. *Id.* As the police approached the defendant, an officer saw him throw something into a bush. *Id.* A gun was recovered, which the officer described as a " '4.5 BB caliber gun with a three inch barrel.' " *Id.*

¶ 38    Our supreme court concluded that this evidence was insufficient to support an inference that the defendant's gun was a dangerous weapon. *Id.* at 277. The court reasoned that the evidence merely showed that the recovered gun was a small BB gun, and there was no evidence that it was loaded. *Id.* In order to show that a gun incapable of firing bullets was a dangerous weapon, the State must present evidence "(1) that the gun was actually used in a dangerous manner, or (2) that the character of the weapon was such that it could conceivably be used as a bludgeon." (Internal quotation marks omitted.) *Id.* at 276. No evidence was presented as to the gun's weight or composition or that the defendant brandished it as a weapon. *Id.* at 277. Therefore, the court found that the evidence at trial precluded a finding that the gun used by the defendant was a dangerous weapon. *Id.*

¶ 39    *Ross* is distinguishable because the question before the supreme court was whether a small BB gun could be considered a dangerous weapon under the armed robbery statute. See 720 ILCS 5/18-1, 18-2(a) (West 2004). Since there was no evidence the BB gun was loaded, the State had to show it was actually used in a dangerous manner or was of a weight and composition, such as metal, that it could be

used as a bludgeon. However, no such evidence was presented at trial. *Ross*, 229 Ill. 2d at 276-77. Here, there was testimony that defendant possessed a dangerous weapon. Officer Graney testified that he saw defendant place a two-tone .380-caliber Bersa Thunder gun in the driver's side window of the Dodge Charger, and Officer Catalano testified that he recovered a two-tone firearm from under the driver's seat, which contained "rounds" that he "cleared" to make it "safe." The pertinent question is whether the officers' testimony was sufficient to support a finding that defendant possessed a firearm as defined by the FOID Act, even though the gun itself was never produced at trial. On this issue, we find *People v. McLaurin*, 2020 IL 124563, instructive.

¶ 40    In *McLaurin*, police sergeant Nicheloe Fraction observed the defendant leave a building holding a silver handgun. *Id.* ¶ 4. She was 50 feet away and had an unobstructed view of the defendant. *Id.* The defendant entered a van, and the vehicle drove away. Fraction never lost sight of the van, and after driving for about 1½ blocks, the van was stopped by police. *Id.* ¶ 5. After the defendant exited the vehicle, Fraction identified him as the person she saw carrying the handgun into the rear passenger side of the van. *Id.* Shortly thereafter, she was asked to identify a handgun recovered by police at the scene. Fraction testified that the recovered gun was " 'the same color [and] size of the handgun I saw the gentleman enter the van with.' " *Id.* She further testified that she was familiar with handguns, having worked with them during her 12 years as a police officer. *Id.*

¶ 41    Officer Jesse Rodriguez testified that he was one of the officers who stopped the van. *Id.* ¶ 7. They ordered the three men inside to exit the vehicle, and the defendant exited through double doors that opened in the middle of the van on the passenger side. *Id.* Faction confirmed that they had stopped the correct vehicle, and she described the gun as a " 'chrome gun.' " *Id.* The officers patted down the men but did not find a gun. *Id.* ¶ 8. While he stood outside the driver's side of the van, Rodriguez looked

underneath the vehicle and saw a 9-millimeter chrome handgun on the ground. *Id.* The gun was located under the middle of the van near the passenger side. *Id.* The gun was loaded, so Rodriguez removed the magazine and bullet from the chamber. *Id.* Although the weapon was inventoried, it was never offered into evidence at trial. *Id.*

¶ 42 The trial court found the defendant guilty of all charges but merged all counts into the armed habitual criminal offense. *Id.* ¶¶ 14, 16. In so finding, the court noted that Fraction's testimony that the defendant possessed a gun was credible and unimpeached. *Id.* ¶¶ 14-15. The appellate court reversed, finding that Fraction's testimony that she observed the defendant carrying a gun, standing alone, was insufficient to show that he possessed a firearm as defined by the FOID Act. *Id.* ¶ 17.

¶ 43 In reversing the appellate court, the supreme court reasoned that eyewitness testimony alone can prove a defendant's criminal possession of a firearm. *Id.* ¶ 31. The court specifically pointed to Fraction's testimony that she saw the defendant " 'in plain daylight' " walk near her vehicle carrying a firearm, and it noted that she was familiar with firearms as a police officer. *Id.* ¶ 36. The court also referred to Rodriguez's testimony that police stopped a van, which Fraction confirmed was the van she saw the defendant enter. After the occupants exited the vehicle, Rodriguez looked under the van and saw a gun that matched the color and description given by Fraction. Rodriguez testified that the gun he recovered was loaded. *Id.* ¶ 37.

¶ 44 The court acknowledged that the testimonial evidence was not overwhelming, where the State did not produce the firearm at trial. *Id*. ¶ 32. However, "regardless of the nature of the evidence," the standard of review for insufficiency of the evidence claims is whether, after viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* ¶ 22 (quoting *Jackson*, 443 U.S. at

319). Viewed in this light, the officers' testimony "was not so unreasonable, improbable, or unsatisfactory that no rational trier of fact could have found beyond a reasonable doubt that defendant possessed a firearm as defined by the FOID Act." *Id.* ¶ 38.

¶ 45    The facts of this case are more similar to *McLaurin* than *Ross*. Officer Graney testified that he was about 5 to 10 feet from defendant when he saw defendant place a two-tone firearm in the driver's side window of the Dodge Charger. Nothing obstructed his view of defendant, and he could see the "majority" of the gun so he knew it was a firearm. Soon after, Officer Graney observed Officer Catalano recover a two-tone Bersa Thunder .380 firearm and a second firearm from under the driver's seat of the Dodge Charger. Although Officer Graney did not testify about his experience and training with guns, the trial court could reasonably infer that, as a police officer, he had knowledge of guns. His testimony identifying a specific type of handgun supports that inference.

¶ 46    Officer Catalano confirmed that he recovered a loaded two-tone firearm from the vehicle and showed the gun to Officer Graney. On cross-examination, defense counsel questioned Officer Catalano on whether he could see the gun from outside the Dodge Charger. He responded that the window on the driver's side was down and he was "quite a bit taller than the vehicle," so he could look "right down through the window." He saw the firearm between Pickens's legs under the seat. After she got out of the car, he searched the vehicle and recovered a second firearm.

¶ 47    The trial court below found the officers' testimony compelling and credible. Our supreme court has determined that the credible testimony of officers can support a finding that defendant possessed a firearm as defined by the FOID Act. *McLaurin*, 2020 IL 124563, ¶ 35. Viewing the evidence in the light most favorable to the State, as we must, we cannot say it compels the conclusion that no reasonable person could accept the trial court's judgment beyond a reasonable doubt.

¶ 48    Defendant next contends that the evidence was insufficient to prove he committed the unlawful use or possession of a weapon offenses (counts II-VII), or to show he defaced the identification marks on the firearms (count VIII). As the State points out, the trial court merged these counts into count I, the armed habitual criminal charge. Therefore, the court did not impose sentences on the offenses set forth in the remaining counts.

¶ 49    In a criminal case, the trial court's final judgment is the sentence, and if no sentenced is imposed, "an appeal cannot be entertained." *People v. Caballero*, 102 Ill. 2d 23, 51 (1984). A reviewing court may have occasion to consider defendant's claims regarding unsentenced convictions where the greater conviction is vacated, so that a nonfinal, unsentenced conviction can be reinstated. See *People v. Dixon*, 91 Ill. 2d 346, 353-54 (1982). However, we have not reversed defendant's armed habitual criminal conviction. As such, defendant's unsentenced convictions for offenses in counts II through VIII are not properly before this court, and we cannot consider his claims on those convictions. *People v. Neely*, 2013 IL App (1st) 120043, ¶ 15.

¶ 50    Defendant's final contention is that this court should remand the matter for a full *Krankel* hearing and appointment of counsel, where his allegations of ineffective assistance of counsel were sufficient to establish possible neglect of his case. When a defendant raises a *pro se* claim of ineffective assistance of counsel, the trial court must conduct a preliminary inquiry into the claim to determine any potential merit. *People v. Roddis*, 2020 IL 124352, ¶ 35. The court should first examine the factual basis of defendant's claim, and if it determines his claim lacks merit or only involves matters of trial strategy, the court may deny defendant's motion without appointing new counsel. *Id.* The trial court is "most familiar with the proceedings at issue" and thus is most effective in distinguishing patently frivolous

16

claims from those showing possible neglect. *Id.* ¶ 56. Therefore, the trial court can consider the merits of defendant's claim in their entirety when determining whether to appoint new counsel. *Id.* ¶ 61.

¶ 51 Whether the trial court conducted a proper preliminary *Krankel* inquiry presents a legal question subject to *de novo* review. *Id.* ¶ 33. "However, if the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *People v. Jackson*, 2020 IL 124112, ¶ 98. "Manifestly erroneous means arbitrary, unreasonable and not based on the evidence." *People v. Wells*, 182 Ill. 2d 471, 481 (1998).

¶ 52 The following facts form the basis of defendant's claim on appeal. Prior to his indictment, defendant was represented by a private attorney. On June 27, 2017, a public defender was appointed, and while defendant was represented by the public defender, the parties completed discovery. However, on October 26, 2017, defendant's private counsel filed an appearance on behalf of defendant. Counsel subsequently informed the court that he would like to obtain squad car or body camera video footage from the night of defendant's arrest. The trial court granted a continuance so that counsel could determine whether such videos existed. On March 26, 2018, defense counsel told the court that the Chicago Police Department indicated it had no videos relating to the incident. Counsel also informed the court that he was attempting to locate two witnesses, one of whom was the owner of the vehicle and had a valid FOID card.

¶ 53 On the next court date, defense counsel informed the court that he was attempting to locate Denzel Tyree, a person listed on the police report. He could not locate the individual on his own and planned to hire a private investigator. When the court asked counsel what Denzel might testify to at trial, counsel stated:

"He can indicate that the defendant, who is alleged to have put a firearm inside a vehicle, he'll contribute that he was there along with multiple other individuals, that they were all stopped, searched, and released. And then eventually, after the search took place, the officers then went to a van where there's a female—"

¶ 54    The trial court responded, "That's enough. I'll give you another continuance to try to find him." On May 18, 2018, defense counsel's answer to discovery listed only Shamone Pickens as a potential defense witness.

¶ 55    After his bench trial, defendant filed a *pro se* motion of ineffective assistance of counsel. In the motion, defendant alleged that his counsel failed to (1) file a motion to suppress defendant's statement that the guns belonged to him; (2) subpoena witnesses Denzel Tyree, Mark Carter, Jimmy Bender, Michael Carter, Brittany Maddison, Cory Rodgers, Davin Rodgers, and "Nathaniel"; (3) subpoena camera footage from police cameras located on the corner of Chicago Avenue and Central Park Avenue; (4) subpoena camera footage from the Harrison and Kedzie police station; (5) subpoena the police radio dispatch prior to the time the police said they witnessed defendant place the gun in the Charger; (6) subpoena dash camera footage from the police vehicle that transported defendant and others to the police station; (7) object to the State's request for a continuance to subpoena Officer Catalano for trial; (8) visit defendant or consult with him regarding trial strategy; (9) make necessary objections during trial; (10) make due process arguments; and (11) subpoena Denzel Tyree's police report.

¶ 56    The trial court conducted a preliminary *Krankel* hearing on defendant's motion. On appeal, defendant challenges only the trial court's determination on his claim that defense counsel failed to investigate witnesses, in particular Denzel Tyree, Michael Carter, and Reginald Roberson. Therefore, we consider only that issue here.

¶ 57 Regarding defendant's claim that his trial counsel failed to subpoena Denzel Tyree, Michael Carter, Mark Carter, Jimmy Bender, Brittany Madison, Corey Rodgers, Diamond Rogers, and "Nathaniel" to testify at trial, the trial court questioned defendant:

Q. Is there anything else that your lawyer did wrong or didn't do?

A. I repeatedly asked him to call my witnesses that was out there. He—he said he did an investigation, but my witnesses said didn't nobody ever come and contact them. They been—

Q. Who are your witnesses?

A. Mark Carter, Denzel Tyree, Jimmy Bender, Nathaniel, Michael Carter—he is resting in peace now He is no longer with us—Brittany Madison, Corey Rogers, Diamond Rogers. You know, they all—

Q. They were all out there?

A. Yes. They all live at the same address, the phone numbers the same, and everything.

Q. What would they have said if they were in court?

A. If they would have come to court, they would have testified that I was in front of 839 North Central Park where I live at. I never told the police anything about a confession, about no gun being mine. And they would explain better about what happened that night. And Denzel— Tyree Denzel is one of the guys that was arrested with me. He wasn't charged with a gun. He was charged with obstruction or something like that. He been willing to come to court from day one to testify because when we was at the police station, he got into it with the police again. You know, it's like all of my—all of my witnesses that say they was coming to court said didn't nobody ever contact them especially Tyree Denzel."

¶ 58 The trial court then asked for counsel's response. Counsel stated that he had Denzel's arrest

report but that it contained nothing relevant to defendant's case. Regarding defendant's claim that counsel failed to subpoena Denzel Tyree, Michael Carter, and the other witnesses, counsel stated:

"Additionally, I tried to locate Mr. Denzel myself. I personally went to the address where he is located on here. He was unavailable. I had talked to [defendant's] friends and family, indicated that if they know anybody who was a witness, to please let me know. The individual who hired me to represent [defendant] knows some of these individuals. I asked him for help, too, if he knows any of these individuals' names.

During the time—the pendency of this case, there are—before trial, there were probably about seven court appearances or so which I appeared before your Honor on this matter. And each time I appeared in court, I had lengthy discussions with [defendant] in the back discussing the case and going over the situations. And at no point in time could he ever give me any specific names other than Tyree Denzel, Michael Carter, who had passed—and I knew I couldn't use him as a witness obviously; he had passed—and there was one other individual by the name of Roberson whose information was found in the vehicle and who was the owner of the vehicle. But based on testimony that he could say and defendant's strategy, there was no reason to call Roberson as a witness.

These other individuals that [defendant] has brought up, their names I have never heard them before. If I would have heard them, I certainly would have investigated them.

I called the [d]efense witness, Shamone—I forget her last name—and had her testify. So it wasn't as if I wasn't provided information from the defendant as I called witnesses; that I would not have sought or tried to locate.

These witnesses that [defendant] now comes up and has names for, I continually asked

20

him for who they were and he said he didn't know them. He only knew the two people he listed, and these were other people out on the street and he didn't know who they were. And now he wants to put in his motion that he gives specificity and he can delineate their specific names and where they were and have communication with them when I continually asked for help regarding that point. I cannot do anything regarding that aspect. If there were witnesses known to me, I certainly would have investigated and called them, but those were not provided."

¶ 59    After the hearing, the trial court stated that it did not believe grounds for relief existed where defendant's *Krankel* claims were "without merit," and it denied the motion. The court, however, took defendant's motion under advisement to read the trial transcripts again. On the next court date, defendant argued that his trial counsel failed to object to a continuance allowing the State to obtain a transcript of Officer Graney's testimony, which could have been used to influence Officer Catalano's testimony. The trial court treated defendant's claim as a motion to reconsider its denial of defendant's *Krankel* claim. The court denied the motion.

¶ 60    The record shows that the trial court questioned defense counsel and also gave defendant an opportunity to discuss his dissatisfaction with defense counsel's representation at trial. The court even took the matter under advisement in order to read through the trial transcripts again. An adequate inquiry consists of "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation," and "[a] brief discussion between the trial court and the defendant." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). We find that the trial court conducted an adequate inquiry into defendant's *pro se* allegations of ineffective assistance of counsel.

¶ 61    We also find that the trial court's denial of defendant's motion, after adequate inquiry, was not manifestly erroneous. In considering defendant's allegations of ineffective assistance of counsel, the

trial court can base its evaluation "on its knowledge of defense counsel's performance at trial" (*id.* at 79) and assess the sufficiency of defendant's allegations in light of the entire record (*People v. Holliday*, 313 Ill. App. 3d 1046, 1049 (2000)).

¶ 62    Defendant contends that his *pro se* claims of ineffective assistance of counsel showed possible neglect where counsel failed to investigate essential witnesses in his case. He points out that counsel mentioned both Denzel and Roberson in pretrial hearings but failed to fully investigate either witness.

¶ 63    However, at the preliminary *Krankel* hearing, defense counsel testified, "I tried to locate Mr. Denzel myself. I personally went to the address where he is located on here. He was unavailable. I had talked to [defendant's] friends and family, indicated that if they know anybody who was a witness, to please let me know." He also testified that he "had lengthy discussions with [defendant]" about his case when they were in court and "at no point in time could he ever give me any specific names other than Tyree Denzel, Michael Carter, who had passed." Counsel stated, "I knew I couldn't use [Carter] as a witness obviously; he had passed." Counsel cannot be faulted for failing to investigate unavailable witnesses. *People v. Williams*, 147 Ill. 2d 173, 247 (1991).

¶ 64    Regarding Roberson, defendant stated in his motion that if "called to be a witness [Roberson] would have testified [that] he doesn't know me, that he is the owner of the vehicle, and everything that was in the vehicle." At the *Krankel* hearing, defense counsel testified that "there was one other individual by the name of Roberson whose information was found in the vehicle and who was the owner of the vehicle. But based on testimony that he could say and defendant's strategy, there was no reason to call Roberson as a witness."

¶ 65    The decision regarding whether to call a certain witness is a "matter[ ] of trial strategy, reserved to the discretion of trial counsel." *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Deciding which theory of

defense to pursue is also trial strategy. *People v. Morris*, 2013 IL App (1st) 110413, ¶ 74. Under established law, a strong presumption exists that these decisions "reflect sound trial strategy, rather than incompetence." *Enis*, 194 Ill. 2d at 378. Thus, trial counsel is generally immune from ineffective assistance of counsel claims regarding such decisions. *Id.* Defendant can overcome this presumption, however, if he shows that trial counsel's decisions were "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 66    At trial, the defense's strategy was to deny that defendant possessed a firearm at all on May 26, 2017, and to deny that he was near the Dodge Charger when the police drove by. Pickens and defendant testified accordingly. In closing argument, defense counsel pointed out that Officer Graney was the only officer who "supposedly" saw defendant place the firearm inside the Charger, and Officer Catalano, who was driving the van, did not see it. Counsel further argued that it was unlikely Officer Catalano could see a gun sticking out from under the driver's seat as he approached the vehicle and looked through the window, because "someone is sitting in the seat." He continued, "The reason why I bring that up is because I think there was a search of this vehicle and other vehicles done and yes, firearms were recovered, but I believe this defendant had nothing to do with that and didn't put any firearms in the vehicle." In other words, the defense's theory was that, even if firearms were found in the Dodge Charger, defendant "had nothing to do with [it]" because he never possessed any firearm that night. Therefore, defense counsel saw no reason to call Roberson, the owner of the vehicle, as a witness. Given the evidence at trial, counsel's decision not to call Roberson as a witness was not so irrational that no reasonably effective defense attorney would have pursued such a strategy under similar circumstances.

23

¶ 67    Furthermore, the fact that Roberson may have owned the firearms found in his vehicle would not preclude a finding that defendant had actual possession of a recovered firearm. Actual possession refers to defendant's physical control over the firearm. *Jones*, 2019 IL App (1st) 170478, ¶ 27. There is no requirement that defendant own the firearm he is charged with possessing. Thus, defendant could have had actual possession of the firearm without owning it, as evidenced by Officer Graney's testimony that he saw defendant pull the firearm out of his waistband and pass it through the window of the Dodge Charger. As such, Roberson's mere ownership of the firearm would not have been relevant to the issue of defendant's actual possession of the firearm.

¶ 68    The failure of counsel to interview witnesses may indicate incompetence when the witnesses are known to counsel and their testimony may be exonerating. *People v. Williams*, 147 Ill. 2d 173, 245 (1991). However, attorney incompetence is not indicated where defendant can point to no potentially favorable testimony the witness might have offered. *Id.* Given the defense's strategy and the evidence in this case, Roberson's testimony that he owned "everything in the vehicle" would not have been exonerating or favorable to the defense.

¶ 69    The trial court considered defendant's claims, heard testimony, re-read the trial transcripts, and concluded that defendant's ineffective assistance of counsel claims were without merit. After reviewing the record, we find that the trial court's determination was not arbitrary, unreasonable, or not based on the evidence.

¶ 70                                                    IV. CONCLUSION

¶ 71    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 72    Affirmed.

---

**No. 1-18-2542**

---

| | |
|---|---|
| **Cite as:** | *People v. Patterson*, 2022 IL App (1st) 182542 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-8773; the Hon. James B. Linn, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Drew A. Wallenstein, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian K. Hodes, and Leslie Billings, Assistant State's Attorneys, of counsel), for the People. |