2023 IL App (1st) 220254-U

No. 1-22-0254

Order filed September 22, 2023

FIFTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 447801 |
| | ) | |
| EDGAR ORTEGA, | ) | Honorable |
| | ) | Adrienne E. Davis, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for first degree murder where (1) the evidence
was sufficient to prove beyond a reasonable doubt that he shot and killed the victim
intentionally or knowingly; and (2) counsel was not ineffective for mentioning but
not adequately developing theories of involuntary manslaughter and second degree
murder.

¶ 2    Following a bench trial, defendant Edgar Ortega was found guilty of first degree murder

and sentenced to 26 years in prison. On appeal, Mr. Ortega contends that his conviction should be

reduced to involuntary manslaughter where the State failed to prove that he shot and killed the

victim, Richard Montclaire, intentionally or knowingly. He further contends that his trial counsel was ineffective for mentioning but failing to adequately develop arguments regarding involuntary manslaughter and second degree murder. We affirm.

¶ 3    Mr. Ortega was charged with the 1993 shooting death of Mr. Montclaire. Following the shooting, Mr. Ortega fled to Mexico until March 2019 when he voluntarily returned to Chicago and was arrested. Following his arrest, a grand jury indicted Mr. Ortega on charges of first degree murder predicated on intentionally or knowingly shooting and killing Mr. Montclaire (720 ILCS 5/9-1(a)(1) (West 1992)) (count I) and shooting Mr. Montclaire knowing that such act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 1992)) (count II).

¶ 4    Mr. Ortega raised the affirmative defense of self-defense during discovery. During opening statements at trial, counsel argued that Mr. Ortega did not start the altercation that resulted in Mr. Montclaire's death; rather, Mr. Montclaire "inexplicably" chased Mr. Ortega, who began "running in fear" and shot Mr. Montclaire in "self-defense." Counsel also posited that "every witness" would testify that Mr. Ortega was "blindly firing over his shoulder" as he ran from Mr. Montclaire.

¶ 5    At trial, Craighton Wierzbowski testified that early on December 18, 1993, he and Steve Nyblom were at Mr. Montclaire's residence on West 78th Street in Chicago drinking beer and working on Mr. Montclaire's vehicle.[1] The three decided to go to Mr. Nyblom's residence. They drove in separate vehicles, with Mr. Montclaire leading. At the intersection of West 78th Street and South Hamlin Avenue, Mr. Montclaire exited his vehicle and ran to the northeast corner, where

---

[1] Steve Nyblom's last name also appears in the record as "Nylund," but we adopt the spelling as it appears in the report of proceedings during his trial testimony.

Mr. Wierzbowski observed Mr. Ortega, whom he identified in court, Nicholas Pirolli,[2] and Guillermo Larrea. Mr. Wierzbowski exited his vehicle, approached the corner, and observed Mr. Montclaire chasing Mr. Ortega around the intersection. As Mr. Ortega and Mr. Montclaire ran, Mr. Wierzbowski heard "pop pop pop" and observed Mr. Ortega looking back at Mr. Montclaire. The State noted for the record that Mr. Wierzbowski demonstrated Mr. Ortega's movement by looking over his right shoulder and "kind of behind him to his side." After the "pop pop pop," Mr. Montclaire chased Mr. Ortega until Mr. Montclaire collapsed. Mr. Wierzbowski did not observe Mr. Montclaire with a weapon.

¶ 6    On cross-examination, Mr. Wierzbowski testified that no one else was in Mr. Montclaire's residence when he, Mr. Montclaire, and Mr. Nyblom decided to go to Mr. Nyblom's residence, but other people may have been present earlier that day. Mr. Wierzbowski did not recall if Kim Cudzik[3] was present that night or if he walked her home. That night, Mr. Montclaire drank three or four beers and mentioned that he wanted to speak with someone named Dennis.[4] Mr. Wierzbowski did not believe that Dennis was on the corner. Mr. Wierzbowski observed that Mr. Ortega looked back at Mr. Montclaire at certain points during the chase.

¶ 7    Mr. Pirolli testified that he was at 78th and Hamlin with Mr. Ortega, Mr. Larrea, and others at approximately 1:45 a.m. the morning of the shooting. When Mr. Montclaire arrived and exited his vehicle, he asked Mr. Pirolli where Dennis was. Mr. Pirolli watched Mr. Wierzbowski approach

---

[2] Nicholas Pirolli's name also appears in the record as "Nick Burley," but we adopt the spelling as it appears in the report of proceedings during his trial testimony.

[3] Counsel referred to Mrs. Cudzik as "Kim McGowan," but we adopt the name as it appears in the report of proceedings during her trial testimony where Mrs. Cudzik explained that McGowan is her maiden name.

[4] Dennis' last name does not appear in the record.

the group, so he did not observe Mr. Montclaire and Mr. Ortega interact. Mr. Pirolli then observed Mr. Montclaire chasing Mr. Ortega. During the chase, Mr. Pirolli heard gunshots and observed Mr. Montclaire fall. Mr. Pirolli went to his house and called 911. He did not observe what Mr. Ortega did after Mr. Montclaire fell and did not observe Mr. Montclaire or Mr. Ortega with a weapon.

¶ 8     On cross-examination, Mr. Pirolli testified that Dennis was not at the scene, and he told Mr. Montclaire that he did not know where Dennis was. Mr. Pirolli ran to his house with Mr. Wierzbowski to call the police.

¶ 9     Mr. Larrea testified that on the morning of the incident, he was with Mr. Ortega, Mr. Pirolli, and two other individuals. Dennis was not present. Around 1:45 a.m., Mr. Montclaire, Mr. Wierzbowski, and Mr. Nyblom approached them. Mr. Montclaire asked, "[w]here the f*** is Dennis?" As Mr. Larrea tried to calm Mr. Montclaire, Mr. Ortega approached Mr. Montclaire and said, "[w]hat are you going to do?" in a confrontational manner. Mr. Montclaire responded, "[w]hat are you going to do?" Mr. Ortega then "cock[ed]" a revolver, and Mr. Montclaire began chasing Mr. Ortega. As they ran, Mr. Ortega discharged the firearm three to five times.

¶ 10    The State described that Mr. Larrea demonstrated that, when Mr. Ortega fired, Mr. Ortega faced Mr. Montclaire "with his right arm outstretched *** straight alongside his body." Mr. Larrea agreed that Mr. Ortega appeared to have been "taking aim." Mr. Montclaire continued running after the shots until he collapsed. Afterwards, Mr. Ortega "took off." Mr. Larrea did not observe Mr. Montclaire with a weapon or anything in his hands.

¶ 11    On cross-examination, Mr. Larrea testified that Mr. Montclaire asked Mr. Ortega where Dennis was, and Mr. Ortega responded, "what are you going to do?" A few hours after the incident,

Mr. Larrea gave a statement to an assistant state's attorney (ASA), which the ASA transcribed and Mr. Larrea signed. The statement reflected that Mr. Ortega said, "what's up?" in response to Mr. Montclaire's question regarding Dennis, and then Mr. Montclaire began chasing Mr. Ortega, who had what appeared to be a firearm in his hands. The statement did not include that Mr. Montclaire responded to Mr. Ortega's question or that Mr. Ortega "cocked" a firearm and walked up to Mr. Montclaire. Mr. Larrea acknowledged that what he said in the statement a few hours after the shooting was probably more accurate than his testimony at trial.

¶ 12    Mrs. Cudzik testified that on the morning of the shooting, she was at Mr. Montclaire's residence with Mr. Wierzbowski, Mr. Montclaire, and Mr. Nyblom. At approximately 1:30 a.m., Mr. Wierzbowski walked Mrs. Cudzik to her house on the corner of 78th and Hamlin. On their walk, she observed Mr. Pirolli, Mr. Larrea, Mr. Ortega, and others on the corner. Through her living room window, Mrs. Cudzik watched Mr. Wierzbowski return to Mr. Montclaire's residence because she was nervous the individuals on the corner would "start problems" with Mr. Wierzbowski. Ms. Cudzik then observed Mr. Wierzbowski, Mr. Nyblom, and Mr. Montclaire enter their vehicles and drive to 78th and Hamlin.

¶ 13    Mr. Montclaire exited his vehicle and approached the group on the corner "with his hands up." Mrs. Cudzik demonstrated Mr. Montclaire's motion, which the trial court described as "her hands extended with the palms up and the fingers facing out from the body." She could not hear what Mr. Montclaire said. As Mr. Montclaire approached the group, Mr. Ortega stepped forward, and then Mr. Montclaire began following Mr. Ortega "around the corner." Mr. Montclaire was "fast paced walking," but not running. Mrs. Cudzik demonstrated Mr. Ortega's motion while

running, which the State described for the record as "pointing back" with her right arm and her head "pointing in the same direction."

¶ 14   As Mr. Ortega and Mr. Montclaire turned the corner, Mrs. Cudzik lost sight of them and then heard gunshots. Through another window, she observed Mr. Montclaire on the ground "full of blood." She ran outside to the porch, but Mr. Ortega was gone. Mr. Wierzbowski ran to her, stated that Mr. Montclaire had been shot, and told her not to move.

¶ 15   Mr. Nyblom testified that at approximately 1:45 a.m., he, Mr. Wierzbowski, and Mr. Montclaire left Mr. Montclaire's residence to go to Mr. Nyblom's residence. They entered their vehicles with Mr. Montclaire leading. Mr. Montclaire stopped at 78th and Hamlin, exited his vehicle, and approached a group on the corner, which included Mr. Larrea, Mr. Pirolli, and Mr. Ortega. Mr. Nyblom walked to the group and talked to Mr. Pirolli, but was unsure who Mr. Montclaire spoke with. Mr. Nyblom then noticed Mr. Montclaire chasing Mr. Ortega, who held a small firearm. Mr. Ortega pointed the firearm over his shoulder, looked back at Mr. Montclaire, and fired three times. Mr. Montclaire fell, and Mr. Nyblom and Mr. Wierzbowski ran to Mr. Montclaire while everyone else scattered. Mr. Nyblom and Mr. Wierzbowski searched for someone to call 911 and ran to Mr. Montclaire's residence to get his mother. Mr. Nyblom did not observe Mr. Montclaire with a weapon.

¶ 16   On cross-examination, Mr. Nyblom testified that he had a "couple" of beers but he, Mr. Wierzbowski, and Mr. Montclaire were not drunk. He first observed the firearm in Mr. Ortega's hand when Mr. Ortega and Mr. Montclaire were near the northwest corner of the intersection.

¶ 17   The State entered several stipulations between the parties.

¶ 18    Anthony Garcia would have testified that he was at the intersection of 78th and Hamlin when Mr. Montclaire was shot. Afterwards, Mr. Garcia observed Mr. Ortega in a backyard near Mr. Garcia's home on West 77th Place. Mr. Ortega asked Mr. Garcia to return to the intersection to retrieve Mr. Ortega's shoe, which had fallen off. Mr. Garcia refused but gave his shoes to Mr. Ortega, who then gave Mr. Garcia the one shoe he had. Mr. Garcia gave an officer Mr. Ortega's shoe.

¶ 19    John Carey, an evidence technician with the Chicago Police Department, would have testified that he recovered a .25-caliber cartridge and cartridge casing from the scene. He also recovered one Puma gym shoe from Mr. Garcia.

¶ 20    Karen Hudy would have testified that early on December 18th, she heard two gunshots, looked out a ground-floor window, and observed Mr. Montclaire lying in the street. Ms. Hudy later noticed that a bullet had entered her dining room, traveled through her kitchen wall, and landed in her sink. An officer recovered the bullet.

¶ 21    Chicago police officer Shore,[5] an evidence technician, would have testified that he recovered a fired ".25 auto bullet" from the kitchen sink of the Hudy residence on West 78th Street.

¶ 22    Dr. Thamrong Chira, who worked for the Cook County Medical Examiner, would have testified that he examined Mr. Montclaire and observed a gunshot wound to his upper left chest. Dr. Chira recovered a deformed small-caliber bullet from a muscle in Mr. Montclaire's right lower back. Mr. Montclaire had a blood alcohol level of 0.09%. Dr. Chira opined that the cause of death was a gunshot wound to the chest, and the manner of death was homicide.

---

[5]Officer Shore's first name does not appear in the record.

¶ 23 Robert Smith, a firearms examiner with the Chicago Police Department, would have testified that he examined the cartridge recovered from the scene, the bullet recovered by the medical examiner, and the bullet recovered from the Hudy residence, and determined that the two bullets were fired from a firearm with "six lands and groves [*sic*] with a right twist."

¶ 24 Federal Bureau of Investigation (FBI) special agent Mark Wallschlaeger would have testified that, in 1995, the FBI was assigned to help locate and apprehend Mr. Ortega. In September 1995, Mr. Wallschlaeger determined that Mr. Ortega was in Mexico, but a political situation prevented Mr. Ortega from being apprehended and extradited. In February 2019, Mr. Ortega's attorneys contacted the FBI and arranged for his surrender in Mexico and return to Chicago.

¶ 25 Chicago police detective Patrick Johnson would have testified that he arrested Mr. Ortega on March 5, 2019, at Chicago O'Hare Airport upon Mr. Ortega's arrival from Mexico.

¶ 26 Finally, an investigator for the Cook County State's Attorney Office and a Chicago police detective would identify photographs, a map, and a hand-drawn diagram depicting the intersection of 78th and Hamlin.

¶ 27 After the State rested, trial counsel moved for a directed finding, arguing that, at the time of the shooting, Mr. Ortega was running from Mr. Montclaire, showing he had "a reasonable belief that he [was] facing great bodily harm." In response, the State argued that Mr. Ortega shot and killed Mr. Montclaire, who was unarmed, in front of multiple witnesses. The court denied the motion.

¶ 28 Chicago police detective Patrick Deenihan testified that he interviewed Mr. Larrea in March 2019. Mr. Larrea stated that he and others, including Mr. Ortega, were on a street corner when Mr. Montclaire "drove up," exited his vehicle, and asked about someone named Dennis. Mr.

Larrea told him that Dennis was not there. Mr. Ortega then said, "what do you want" or "what's up" to Mr. Montclaire. Mr. Montclaire did not respond verbally, but attempted to close the distance between himself and Mr. Ortega and began chasing him. Mr. Larrea observed Mr. Ortega shoot Mr. Montclaire but did not recall whether Mr. Ortega held the firearm in his right or left hand or which way he turned. Mr. Larrea thought Mr. Ortega held the firearm in his right hand, positioned over his left shoulder, but was not certain.

¶ 29    On cross-examination, Detective Deenihan reiterated that Mr. Larrea was unsure which hand Mr. Ortega held the firearm in, but Mr. Larrea asserted that Mr. Ortega would have turned towards his left when he fired. On redirect examination, Detective Deenihan stated that his report reflected that Mr. Larrea thought Mr. Ortega placed his right hand over his left shoulder.

¶ 30    During closing arguments, defense counsel posited that Mr. Ortega "immediately" ran from Mr. Montclaire, who, according to counsel, was physically larger than Mr. Ortega and intoxicated. Counsel asserted that Mr. Ortega was "about to get pummeled by some guy who is very angry and so he runs, and so it is self-defense." Counsel argued that Mr. Ortega was:

> "running to defend himself. He is allowed to use force. If he is somehow mistaken in the amount of force to use, that is second-degree murder. It's not murder, *** he's blindly shoot [*sic*] behind you [*sic*] just to make him stop, that might be reckless but none of this changes the fact that it's self-defense."

¶ 31    Counsel added that although Mr. Ortega fled the country, he ultimately did the "right thing" by surrendering to law enforcement, and "he should be found not guilty because he reasonably defended himself."

¶ 32    In finding Mr. Ortega guilty of both counts of first degree murder, the court stated that it carefully considered the testimony, and the record did not establish that Mr. Ortega "should have, did or otherwise believed that he was in fear of great bodily harm." The court emphasized that one cannot bring a firearm to a fistfight, and, in this instance, "it didn't even become a fistfight. When someone yells at you and goes after you, you just can't shoot."

¶ 33    Trial counsel subsequently filed a motion to withdraw, which the court granted.

¶ 34    Mr. Ortega obtained new posttrial counsel, who filed a motion for a new trial, arguing, *inter alia*, that trial counsel was ineffective for attempting to raise theories of self-defense and second degree murder without supporting evidence as required by statute, and failing to request a finding of involuntary manslaughter. At the hearing on the motion, posttrial counsel argued that, although trial counsel asked for findings of self-defense or second degree murder, the court had no choice but to find Mr. Ortega guilty of first degree murder as trial counsel presented no evidence for whether Mr. Ortega's belief that he could use deadly force was reasonable. The court denied the motion. With regard to trial counsel's alleged failure to support the self-defense and second degree murder arguments, the court stated that Mr. Ortega was not required to testify or present witnesses and the court respected those rights. Regarding trial counsel's failure to request a finding of involuntary manslaughter, the court stated that "the facts of this case speak for themselves."

¶ 35    Following a hearing, the trial court sentenced Mr. Ortega to 26 years in prison. The court orally indicated that the two counts for first degree murder would merge, but did not state which count would merge into the other. The mittimus reflects sentences on both counts and states "COUNT 1 & 2 MERGE," with no clarification of which count merged into the other.  Mr. Ortega filed a motion to reconsider sentence, which the court denied. Following the denial, Mr. Ortega

filed a timely notice of appeal. We find that we have jurisdiction to consider the merits of this appeal pursuant to Illinois Supreme Court Rule 606 (eff. July 1, 2017).

¶ 36     On appeal, Mr. Ortega first argues that the State failed to prove that he intentionally or knowingly shot Mr. Montclaire and that he did not know that his actions were "practically certain" to cause Mr. Montclaire's death. He further contends that, at most, he acted recklessly, and therefore, this court should reduce his conviction to the lesser-included offense of involuntary manslaughter.

¶ 37     When a defendant challenges the sufficiency of the evidence to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67; see also *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The State must prove every element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. It is the trier of fact's role to assess the credibility of witnesses, weigh the evidence, resolve conflicts and inconsistencies in the evidence, and draw reasonable inferences from the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). We will not retry a defendant, nor overturn a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of a defendant's guilt. *People v. Conway*, 2023 IL 127670, ¶ 16.

¶ 38     As an initial matter, we must consider which of the two murder counts is at issue on appeal. The trial court found Mr. Ortega guilty of intentional/knowing murder on count I and strong probability murder on count II. The counts arose from the same shooting, and the trial court therefore properly merged the two counts. *People v. Coats*, 2018 IL 121926, ¶ 11 ("a criminal

defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act."). However, the court did not verbally specify which count would merge into the other. Similarly, the mittimus reflects sentences on both counts and states "COUNT 1 & 2 MERGE," with no clarification of which count merged into the other.

¶ 39    Only sentenced counts are final for purposes of appeal. *People v. Patterson*, 2022 IL App (1st) 182542, ¶ 49 ("In a criminal case, the trial court's final judgment is the sentence, and if no sentenced is imposed, 'an appeal cannot be entertained.' " (quoting *People v. Caballero*, 102 Ill. 2d 23, 51 (1984))). Thus we must determine which of the two counts is final for purposes of this appeal.

¶ 40    When, as here, two guilty findings are based on the same conduct, the less serious offense is merged into the more serious offense. *People v. Walker*, 2011 IL App (1st) 072889, ¶ 39 ("When multiple murder convictions have been entered for the same act, only the conviction for the most serious charge should be reflected on the mittimus."). Intentional/knowing murder (count I) is a more serious offense than strong probability murder (count II). *People v. Cardona*, 158 Ill. 2d 403, 412 (1994). Necessarily therefore, count II would merge into count I (*id.*), and we therefore presume the trial court intended to merge count II into count I, and Mr. Ortega's sentence was therefore on count I.[6] Accordingly, only the sentence on count I for intentional/knowing murder is final for purposes of appeal. See *Patterson*, 2022 IL App (1st) 182542, ¶ 49 (stating that this court cannot consider a challenge to a guilty finding on an unsentenced count). We vacate the sentence

_____

[6] This determination is reinforced by the fact that Mr. Ortega challenges the sufficiency of the evidence demonstrating intentional/knowing murder (count I) and does not challenge the evidence demonstrating strong probability murder (count II), the less serious offense.

on count II (strong probability murder) reflected on the mittimus, and order the clerk of the circuit court to correct the mittimus to reflect only a sentence on count I.

¶ 41    As relevant here, a defendant commits first degree murder when he or she kills an individual without lawful justification and, in performing the acts which caused the death, "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 1992). Mr. Ortega does not dispute that he performed the act that caused Mr. Montclaire's death but challenges his mental state while performing the act.[7]

¶ 42    First degree murder requires a mental state of intent or knowledge. *Id.* An individual acts intentionally when he engages in conduct with the "conscious objective" or purpose to accomplish the result described by the statute defining the offense. 720 ILCS 5/4-4 (West 1992). "An individual acts with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26. A defendant's mental state may be inferred from surrounding circumstances, including the character of his acts and the nature and seriousness of the victim's injuries. *People v. Lengyel*, 2015 IL App (1st) 131022, ¶ 47. A defendant's mental state is a question to be resolved by the trier of fact. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 68.

¶ 43    In this case, taking the evidence in the light most favorable to the State as we must, we find the evidence sufficient to prove Mr. Ortega guilty of first degree murder. The evidence established that Mr. Montclaire approached Mr. Ortega, Mr. Pirolli, and Mr. Larrea and asked for the

---

[7] Although Mr. Ortega argued self-defense at trial, on appeal he does not argue that the State failed to rebut the self-defense claim beyond a reasonable doubt. The argument is therefore forfeited. "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

whereabouts of someone named Dennis. Mr. Pirolli responded that he did not know where Dennis was. As Mr. Larrea attempted to calm Mr. Montclaire, Mr. Ortega approached Mr. Montclaire in a confrontational manner and said, "[w]hat are you going to do?" and "[w]hat's up?" Mr. Ortega then "cocked" a firearm, and Mr. Montclaire chased him around the intersection.

¶ 44    Mr. Wierzbowski demonstrated that Mr. Ortega was looking over his right shoulder, behind, and to the side, when Mr. Wierzbowski heard the gunshots. Mr. Larrea's demonstration showed that Mr. Ortega stood with his right arm stretched straight along his body as if he were aiming, and he testified that Mr. Ortega was facing Mr. Montclaire when he discharged the firearm multiple times. Mr. Nyblom observed Mr. Ortega aim the firearm over his shoulder, look back, and discharge the firearm at Mr. Montclaire approximately three times.

¶ 45    The witnesses consistently testified that Mr. Ortega looked in Mr. Montclaire's direction, aimed the firearm, and discharged it multiple times, fatally shooting Mr. Montclaire in the chest. There is no evidence that Mr. Montclaire was carrying a weapon at the time of the shooting. A rational trier of fact could have concluded that Mr. Ortega intentionally or knowingly shot and killed Mr. Montclaire when he voluntarily and willfully aimed the firearm in Mr. Montclaire's direction and discharged it. See *People v. Lee*, 256 Ill. App. 3d 856, 861 (1993) ("It is not necessary to directly prove that defendant had the intent to murder; all that needs to be shown is that defendant voluntarily and willfully committed an act, the natural tendency of which was to cause death or great bodily harm.").

¶ 46    Nevertheless, Mr. Ortega argues that his mental state at the time of the shooting was reckless, and his conviction should be reduced to the lesser-included offense of involuntary manslaughter.

¶ 47 The mental state that accompanies the conduct that results in the victim's death differentiates first degree murder and involuntary manslaughter. *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 69. The mental state for first degree murder is intent or knowledge, and the mental state for involuntary manslaughter is recklessness. *People v. Givens*, 364 Ill. App. 3d 37, 44 (2005). An individual acts recklessly when he "consciously disregards a substantial and unjustifiable risk" that the result described by the statute defining the offense will follow from his conduct, and that "disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 1992). A defendant is not entitled to a reduction of first degree murder to involuntary manslaughter by asserting a hidden mental state known only to the defendant and unsupported by the facts. *People v. Jackson*, 372 Ill. App. 3d 605, 614 (2007).

¶ 48 Here, the State adduced testimony from individuals who were present at the intersection and witnessed Mr. Ortega fire towards Mr. Montclaire. Mr. Ortega contends that he "wildly" discharged the firearm behind him without looking and did not stop to aim, but continued running while he was firing. However, the testimony of the State's witnesses revealed that as Mr. Montclaire chased Mr. Ortega around the intersection, Mr. Ortega faced Mr. Montclaire, intentionally aimed the firearm behind him, and discharged it multiple times in Mr. Montclaire's direction. A defendant who aims a firearm towards the intended victim and discharges it has not acted recklessly. *People v. Washington*, 399 Ill. App. 3d 664, 676 (2010) ("Illinois courts have clearly and consistently held that when a defendant points a firearm in the direction of an intended victim and fires the weapon, he has not acted recklessly."). Accordingly, the evidence was sufficient to sustain the court's finding of first degree murder.

¶ 49    Mr. Ortega next argues that trial counsel was ineffective for mentioning but not adequately developing arguments for involuntary manslaughter and second degree murder. According to Mr. Ortega, counsel merely made "passing mentions" to these theories and "did nothing else to persuade the court to consider a lesser-mitigated or lesser-included conviction."

¶ 50    In criminal prosecutions, every defendant has a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). To succeed on a claim of ineffective assistance, a defendant must establish that (1) counsel's performance was deficient, and (2) counsel's "deficient performance resulted in prejudice." *People v. Lewis*, 2022 IL 126705, ¶ 44. To establish deficient performance, a defendant must "overcome the presumption that *** the challenged action might be considered sound trial strategy." *Id.* To establish prejudice, a defendant must demonstrate a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. If a defendant fails to establish prejudice, this court need not consider whether counsel's conduct was deficient. *People v. Garcia*, 2023 IL App (1st) 172005, ¶ 55. This court reviews *de novo* whether trial counsel's actions support an ineffective assistance claim. *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008).

¶ 51    At the outset, the State argues that Mr. Ortega's claim for ineffective assistance must fail because trial counsel raised theories of self-defense and second degree murder, and, moreover, the evidence did not support a finding of guilt for involuntary manslaughter.

¶ 52    The record reflects that Mr. Ortega raised the affirmative defense of self-defense during discovery. At trial, during opening statements, trial counsel argued that Mr. Ortega was not the initial aggressor, but ran in fear from Mr. Montclaire and shot him in "self-defense." Counsel also posited that the evidence would show that Mr. Ortega "blindly fir[ed]" over his shoulder as he ran

from Mr. Montclaire. During closing arguments, counsel submitted that Mr. Ortega, who was "about to get pummeled" by Mr. Montclaire, was "allowed to use force" and acted in "self-defense." Counsel added that if Mr. Ortega were "somehow mistaken in the amount of force to use, that is second degree murder." Counsel further argued that were Mr. Ortega "blindly shoot[ing]" behind him to deter Mr. Montclaire from chasing him, "that might be reckless but none of this changes the fact that it's self-defense."

¶ 53    Viewing this record as a whole, it is apparent that trial counsel asked the court to consider not only self-defense, but also second degree murder and involuntary manslaughter. Notwithstanding, Mr. Ortega's claim of ineffective assistance also fails for lack of prejudice. It was the court's role, as trier of fact, to weigh the testimony and evidence, and the court rejected each defense theory. As noted, the witnesses consistently testified that Mr. Ortega looked in Mr. Montclaire's direction, aimed the firearm, and voluntarily and willfully discharged it multiple times, fatally shooting Mr. Montclaire, who was unarmed. This supported a conviction for first degree murder and belied the notion that Mr. Ortega acted with a reasonable or unreasonable belief in the need for self-defense. *Lee*, 256 Ill. App. 3d at 861. Moreover, Mr. Ortega's action of aiming the firearm towards Mr. Montclaire and discharging it did not support a reckless state of mind. *Washington*, 399 Ill. App. 3d at 676. Therefore, the court did not find sufficient evidence to find defendant guilty of involuntary manslaughter or second degree murder. We will not substitute our judgment for that of the trial court. *Conway*, 2023 IL 127670, ¶ 16. Accordingly, Mr. Ortega failed to demonstrate a reasonable probability that but for counsel's alleged failure to adequately develop arguments for involuntary manslaughter and second degree murder, the outcome of his trial would have been different to establish prejudice under *Strickland*. Since Mr. Ortega failed to establish

that he suffered prejudice, this court need not consider whether counsel's performance was deficient. *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 40.

¶ 54     Mr. Ortega briefly asserts that posttrial counsel was ineffective for failing to provide sufficient detail of the second degree murder and involuntary manslaughter theories in the posttrial motion. The success of Mr. Ortega's claim that posttrial counsel was ineffective hinges on the success of his allegation that trial counsel's failure to adequately argue second degree murder and involuntary manslaughter constituted ineffective assistance. As discussed, no prejudice resulted from trial counsel's alleged failure to adequately develop arguments for second degree murder and involuntary manslaughter, and therefore, no prejudice could result from posttrial counsel's alleged failure to provide sufficient detail of either theory in the posttrial motion. See *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 96.

¶ 55     In sum, the evidence was sufficient to prove Mr. Ortega intentionally or knowingly shot Mr. Montclaire to support the guilty finding for first degree murder, and Mr. Ortega's claim for ineffective assistance of counsel fails for lack of prejudice. We therefore affirm Mr. Ortega's conviction for intentional/knowing first degree murder on count I. We order  the sentence on count II be vacated and the clerk of the circuit court to correct the mittimus to reflect only a sentence on count I.

¶ 56     Affirmed, with directions.