NOTICE

Decision filed 12/10/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231296-U

NO. 5-23-1296

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 22-CF-1549 |
| | ) | |
| LEXUS M. SCALES, | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justice Hackett* concurred in the judgment.
Justice McHaney specially concurred in the judgment.

**ORDER**

¶ 1   *Held*: The evidence presented at trial was sufficient to support a conviction where the affirmative defense of necessity was not proven. The aggravated unlawful use of a weapon statute and the firearm concealed carry act are not facially unconstitutional or unconstitutional as applied to the defendant, under the second amendment of the United States Constitution.

¶ 2   After a bench trial, the defendant, Lexus M. Scales, was convicted of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2022)) and was sentenced to 12 months of conditional discharge. The defendant appeals and argues that the evidence was insufficient to support her conviction where the evidence demonstrated that an affirmative defense

---

*Justice Hackett was not present at oral argument as he was later substituted on the panel. He has read the briefs and listened to the recording of oral argument.

1

of necessity was applicable. The defendant additionally argues, for the first time on appeal, that the AUUW statute and the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2022)) are facially unconstitutional and as applied to the defendant, under the test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). For the following reasons, we affirm the judgment of the circuit court of Macon County.

¶ 3                                     I. BACKGROUND

¶ 4        On October 21, 2022, the defendant was in the process of moving her family into a new home with her friends, Kahlia Smith and Deonte Smith. As the day progressed, tensions escalated. The defendant left the house with her children and Kahlia followed the defendant to her vehicle as they argued. As they continued arguing, the defendant opened the trunk of her vehicle, removed a loaded firearm, and held it in front of her to make Kahlia back off. Kahlia retreated and the defendant then returned the firearm to the trunk, entered the vehicle, and called the police. Subsequently, the defendant was charged by information with one count of AUUW (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2022)).

¶ 5        On July 7, 2023, the defendant filed a pleading asserting the affirmative defense of necessity. The defendant claimed that Kahlia struck the defendant while the defendant was holding her toddler daughter. She additionally asserted that the firearm had been kept in the trunk of her vehicle.

¶ 6        The circuit court held a bench trial on October 24, 2023. The parties waived opening statements and stipulated to the testimony of John Strode. The stipulation included that Strode worked for the Illinois State Police in the Firearm Services Bureau and reviewed records for individuals with licenses under the Firearm Concealed Carry Act. According to Strode's review of the Illinois State Police records, a concealed carry license (CCL) under the Firearm Concealed

2

Carry Act had never been issued to the defendant. The stipulation of testimony by Strode was admitted into evidence.

¶ 7     Kahlia Smith testified that she had been charged with aggravated battery in People v. Smith, No. 22-CF-1550 (Cir. Ct. Macon County), and those charges were in connection with the incident involving the defendant on October 21, 2022. The State had agreed to dismiss the aggravated battery charges against Kahlia in exchange for her truthful testimony at the defendant's trial.

¶ 8     Kahlia testified that she had been the defendant's friend since childhood. On October 21, 2022, the defendant and her two children were moving into a new home with Kahlia, and Deonte Smith, the father of Kahlia's children. Kahlia testified that the defendant was offered the basement of the house where she could live with her children. The basement needed to be "properly prepared" and cleaned before the defendant could move in. The defendant became angry and repeatedly told Smith that she was going to stay at a shelter as they were preparing the home. Kahlia eventually told the defendant, "okay go." The defendant then walked out of the house carrying her youngest child on her hip. Kahlia followed the defendant to her vehicle, which was parked on the street in front of the house, to retrieve the house keys. Deonte had been on the front porch, and he followed Kahlia and the defendant to the front yard. Kahlia testified that the defendant put her children inside of the car and then walked around the car to open the trunk. The defendant pulled out a gun from the trunk of her car and pulled the trigger while she was standing in the street. Kahlia ran away.

¶ 9     Kahlia testified that she was not aggravated with the defendant, she was only "disappointed." Kahlia additionally testified that she had been arguing with the defendant as they headed towards the defendant's vehicle. The State questioned Kahlia on statements that the

3

defendant had made to the police. The defendant had claimed that Kahlia had pushed her while the defendant was carrying her child, and that Kahlia "popped her in the lip." Kahlia claimed that the defendant had made up those allegations; she never touched the defendant. Kahlia further claimed that when the police arrived, there was nothing wrong with the defendant.

¶ 10    On cross-examination, Kahlia claimed that she had not yelled at the defendant. Deonte had been present during the incident. He was on crutches. Kahlia additionally testified that the defendant was the person who had called the police.

¶ 11    Officer Rydick Braden with the Decatur Police Department testified that he was working as a patrol officer on October 21, 2022. Braden was wearing video recording equipment (body cam) which recorded what occurred after he arrived on the scene. The body cam recording depicted the defendant showing Braden her firearm owner's identification (FOID) card and her driver's license. The recording was admitted into evidence. Braden also testified that he had viewed the defendant's two IDs on the scene, and he identified the defendant in the courtroom.

¶ 12    On cross-examination, Braden testified that he had observed two children inside of the defendant's car. The defendant was cooperative and told the police officers that the firearm was in the trunk of her vehicle.

¶ 13    Jacob Throneburg, a police officer with the City of Decatur, testified that he was also on duty on October 21, 2022, and had interacted with the defendant. His body cam footage was admitted into evidence. Throneburg's body cam depicted him walking towards the defendant who was sitting inside of her vehicle with the windows up. As Throneburg approached the vehicle, shouting could be heard in the background. Throneburg recovered a loaded firearm from the trunk of the defendant's vehicle.

¶ 14    On cross-examination, Throneburg testified that the defendant was cooperative, and that he had observed Kahlia yelling. Throneburg additionally observed that the defendant was in the process of moving, and the trunk was packed with personal possessions. The firearm would not have been accessible to the defendant while she drove her vehicle. Throneburg testified that the defendant's face was injured. She had a bruised lip. Throneburg believed that the injury was consistent with "somebody pushing a hand into her face." The State rested after Throneburg's testimony concluded.

¶ 15    The defendant testified, on her own behalf, that she had been at Kahlia's house on the evening of October 21, 2022. Kahlia became aggravated with the defendant for not "helping enough." The defendant decided to leave Kahlia's home, holding her two-year-old daughter on her hip. After exiting the residence, Kahlia and Deonte followed the defendant to the defendant's vehicle. The defendant testified that Kahlia threatened to "drag me," "whoop my a***," "beat my a***," "f*** me," "f*** my kids," and "all types of stuff." Kahlia then "reach[ed] in and palmed my hand back—my face back" which injured the defendant's upper lip. The defendant was still holding her two-year-old daughter at that time.

¶ 16    The defendant testified that she was crying when she put her toddler into her vehicle. Kahlia and Deonte continued to confront her. The defendant testified that, "I opened my trunk, grabbed my pistol, held it down in front of me, told them both to get the f*** back." The defendant repeated it to Kahlia and Kahlia ran off. The defendant believed that Kahlia ran to grab her own firearm. The defendant returned her firearm to the trunk of her car and then got into her vehicle to leave. Kahlia and Deonte blocked her from leaving and were banging on the vehicle. The defendant additionally testified that she never pointed her firearm at anyone, and she never racked or cocked the firearm. The firearm had been loaded.

5

¶ 17    On cross-examination, the defendant explained that Kahlia and Deonte were also moving into the house. They had all lived together at their prior residence. The defendant admitted that she had parked in the street and was standing in the street when she grabbed the firearm from the trunk of her vehicle. Deonte had a sprained ankle and was using crutches. He remained by the vehicle after the defendant had grabbed her gun, and after Kahlia ran. The defendant explained that Kahlia only ran to her own car, which was parked in the driveway behind the defendant's vehicle. Kahlia returned before the defendant was able to leave, and Kahlia was banging on the defendant's driver's side window. The defendant claimed that she would not have been able to drive away without hitting Kahlia and Deonte.

¶ 18    The parties presented closing arguments. The State argued that the case was factually simple. The defendant did not have a CCL, and she had pulled a loaded firearm from the trunk of her car while standing on a public street. The State deferred the remainder of its closing argument for rebuttal in anticipation of a defense being presented.

¶ 19    The defendant admitted that she had pulled the firearm from the trunk of her vehicle, placed the firearm in front of her, and told an aggressive person to get back. After the aggressor left, the defendant secured the gun back into the trunk of her car, which was not immediately accessible. The defendant agreed that "in a vacuum" the defendant's actions were in violation of the statute. However, the affirmative defense of necessity justified the defendant's actions of grabbing a firearm from her trunk. She held the gun pointing downwards, without cocking it, in response to being threatened, physically and verbally. The defendant was protecting herself and her children, and because she felt threatened, she was justified in displaying a firearm.

¶ 20    The State presented its rebuttal argument and claimed that the body cam footage had also depicted the defendant screaming and threatening Kahlia. The body cam footage did not depict

any cars blocking the defendant from driving away. The evidence demonstrated that the defendant had held a gun in front of herself, which threatened intense violence. The defendant, however, did not think she did anything wrong, and she called the police and waited. After the police arrived, the defendant was shocked that she was arrested for pulling out a loaded firearm on a public street, without a CCL. The State argued that the defendant's actions had placed her children in danger.

¶ 21 The circuit court considered that the defendant had not been on her own land or fixed place of business. "The firearm was uncased, loaded and immediately accessible." And the defendant had not been issued a valid CCL.

¶ 22 The circuit court additionally considered the defense of necessity and found that it could be raised in unlawful use of weapons charges. The circuit court considered the facts and circumstances and indicated that there were inconsistencies in both the defendant's and Kahlia's testimony. The circuit court found that Kahlia was "probably aggravated," "not just disappointed." Kahlia had denied pushing her hand into the defendant's mouth, contrary to the defendant's testimony. The defendant's mouth had been bleeding, and the circuit court considered that something had occurred. The circuit court then considered whether the defendant had any other recourse than pulling out a gun and found that, under the circumstances, the defendant could have left in her car. The defense of necessity was not found to be a valid affirmative matter. The defendant was found guilty of AUUW as the State had proven their case beyond a reasonable doubt.

¶ 23 The defendant filed a motion to reconsider the judgment, which was denied by the circuit court. At the sentencing hearing, the State presented an agreed disposition. The defendant was placed on 12 months of conditional discharge, and the firearm was forfeited. This appeal followed.

7

¶ 24                                   II. ANALYSIS

¶ 25    On appeal, the defendant argues that the State failed to meet the burden of proof beyond a reasonable doubt where it failed to disprove that the defendant was without blame in prompting Kahlia's violence and that defendant responded reasonably to prevent greater injury. The defendant additionally challenges whether the AUUW and the Firearm Concealed Carry Act are constitutional, raising facial and as-applied challenges, claiming that both violate the second amendment.

¶ 26    The fourteenth amendment's due process clause mandates that a defendant cannot be convicted " 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004)). On a challenge to the sufficiency of the evidence, we must determine " ' 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A conviction will only be overturned on appeal if the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt about the defendant's guilt remains. *People v. Wright*, 2017 IL 119561, ¶ 70. "It is the trial court's responsibility as trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom." *People v. Patterson*, 2022 IL App (1st) 182542, ¶ 33.

¶ 27    A person commits the offense of AUUW when he or she knowingly:

> "(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm;
>                                   * * *

8

(3) One of the following factors is present:

* * *

(A-5) the pistol, revolver, or handgun possessed was uncased, loaded, and immediately accessible at the time of the offense and the person possessing the pistol, revolver, or handgun has not been issued a currently valid license under the Firearm Concealed Carry Act;" 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2022).

The AUUW statute requires an individual to obtain a valid license under the Firearm Concealed Carry Act and a Firearm Owner's Identification Card in order to possess a firearm. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5), (a)(3)(C) (West 2022). The Firearm Owner's Identification Card Act (FOID Card Act) authorizes a licensee to "acquire or possess any firearm" after a Firearm Owner's Identification Card (FOID card) is issued by the State Police. 430 ILCS 65/2(a)(1) (West 2022). "To carry a firearm in accordance with the Concealed Carry Act, a licensee must completely or mostly conceal the firearm or carry it in a vehicle. 430 ILCS 66/5 (West 2020). (' "Concealed firearm" means a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public or on or about a person within a vehicle.'); *id.* § 10(c) (CCL licensee may carry concealed firearm)." *People v. Thompson*, 2025 IL 129965, ¶ 16. "Open carriage of a ready-to-use firearm is illegal in Illinois, regardless of licensure." *Thompson*, 2025 IL 129965, ¶ 16.

¶ 28    The evidence demonstrated that the defendant had a FOID card but did not have a CCL. The defendant knowingly carried an uncased and loaded handgun. She was not on her own land, her own abode, or in a fixed place of business. The handgun was immediately accessible to her when she removed it from her trunk and displayed it in the street in front of Kahlia's house.

¶ 29    The defendant claims that the affirmative defense of necessity justified her conduct. Necessity can be raised as a defense to a charge of AUUW. *People v. Crowder*, 2018 IL App (1st) 161226, ¶ 29. Section 7-13 of the Criminal Code of 2012 (720 ILCS 5/7-13 (West 2022)) provides:

9

"[c]onduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2022).

Furthermore, the defense of necessity is viewed as "involving the choice between two admitted evils where other optional courses of action are unavailable [citations], and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *People v. Janik*, 127 Ill. 2d 390, 399 (1989).

¶ 30     The evidence presented at trial did not justify brandishing a loaded firearm while standing in the street. The defendant and Kahlia had been arguing while the defendant was carrying her two-year-old daughter. Kahlia had allegedly hit the defendant in the face while the defendant was holding her daughter. Although Kahlia disputed that she had physically assaulted the defendant, Throneburg observed that the defendant's lip had been injured, consistent with the defendant's testimony. The circuit court considered that the defendant had been struck by Kahlia and reasonably concluded that the incident was insufficient to establish a threat that warranted drawing a firearm. Additionally, the defendant was not carrying a firearm when she was struck. She had to place her child in the vehicle, walk to the trunk, open the trunk, and then grab the firearm. At that point, the defendant could have just entered her vehicle with her children and left.

¶ 31     Moreover, the defendant believed that after she took out her firearm, Kahlia left to get her own firearm. This reveals that Kahlia was not armed when the defendant pulled out her firearm. The defendant escalated the situation. According to the defendant's testimony, Kahlia and Deonte were banging on the car window preventing her from leaving after she had pulled out her firearm and returned it to her trunk. It was not reasonable for the defendant to believe that brandishing a

10

firearm while standing in the street was necessary to avoid injury. The circuit court's determination that the defense of necessity was not applicable to the evidence presented was not in error.

¶ 32    We turn to the defendant's claim that her conviction should be vacated, claiming that the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2022)) and the AUUW statute (720 ILCS 5/24-1.6 (West 2022)) are unconstitutional. The defendant raised both facially and as applied constitutional challenges that the Firearm Concealed Carry Act and the AUUW violated the second amendment of the United States Constitution pursuant to the United States Supreme Court in *Bruen*, 597 U.S. 1.

¶ 33    A constitutional challenge to a criminal statute may be raised at any time. *People v. Wright*, 194 Ill. 2d 1, 23 (2000). All statutes carry a strong presumption of constitutionality and the party making the challenge must clearly establish its invalidity to overcome this presumption. *People v. Mosley*, 2015 IL 115872, ¶ 22. "Courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving any doubts in favor of the statute's validity." *People v. Rizzo*, 2016 IL 118599, ¶ 23. The question of whether a statute is constitutional is reviewed *de novo*. *People v. Aguilar*, 2013 IL 112116, ¶ 15.

¶ 34    "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. "In contrast, a facial challenge requires a showing that the statute is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant." *Thompson*, 2015 IL 118151, ¶ 36. A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid. *Burns v. Municipal Officers Electoral Board of the Village of Elk Grove Village*, 2020 IL 125714, ¶ 13. If it is reasonably

possible to construe the statute in a way that preserves its constitutionality, we must do so. *Rizzo*, 2016 IL 118599, ¶ 24.

¶ 35     The second amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In Illinois, the right to bear arms is governed by both civil and criminal statutes. *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 50.

¶ 36     The United States Supreme Court in *Bruen* recognized that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. *Bruen* announced a two-part analysis for review of laws affecting the right to bear arms, and the standard for applying the second amendment is as follows:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 24.

Simply, "the two-part process requires us to determine (1) whether defendant's conduct falls within the plain text of the second amendment and, if so, (2) whether there is a justification for the regulation rooted in history and tradition." *People v. Travis*, 2024 IL App (3d) 230113, ¶ 24.

¶ 37     The Illinois Supreme Court in *Thompson* considered whether "section 24-1.6(a)(1), (a)(3)(A-5) violates the second amendment (U.S. Const., amend. II) by categorically banning law-abiding citizens from openly carrying a handgun in public and enforcing an ahistorical double licensing process that mandates both a concealed carry license (CCL) and a Firearm Owner's Identification (FOID) card." *Thompson*, 2025 IL 129965, ¶ 1. *Thompson* addressed the *Bruen* decision and noted that "the *Bruen* Court went out of its way to address the precise issue presented in this appeal: whether shall-issue firearm licensing regimes, like those set forth in Illinois's

Concealed Carry Act and FOID Card Act, comport with the second amendment." *Thompson*, 2025 IL 129965, ¶ 38. *Thompson* found that "the foundation of *Bruen*'s holding is the difference between the proper-cause requirements in may-issue licensing regimes and the objective requirements in shall-issue licensing regimes," and focused on footnote 9 in the *Bruen* decision, which states:

> "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a [permit]. [Citation.] Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [Citation.] Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' [Citation.] And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, [citation], rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' [citation]—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." (Internal quotation marks omitted.) *Bruen*, 597 U.S. at 38 n.9. 1; *Thompson*, 2025 IL 129965, ¶ 39.

¶ 38    The defendant here, as the defendant in *Thomspon*, attempted to diminish the significance of the above-quoted language because it appeared as a footnote in the *Bruen* decision. "[T]he location, whether in the text or in a footnote, of something which the writer of an opinion thinks should be said, is a matter of style which must be left to the writer." *People v. Thompson*, 2025 IL 129965, ¶ 40 (quoting *Phillips v. Osborne*, 444 F.2d 778, 782 (9th Cir. 1971)).

¶ 39    *Thompson* found that,

> "the United States Supreme Court expressly held in *Bruen* that shall-issue firearm licensing regimes, like the one enacted in Illinois, comport with the second amendment because they do not contain the problematic features of New York's licensure regime—the unchanneled discretion for licensing officials and the special-need requirement—which effectively deny the right to carry handguns for

13

self-defense to many ordinary, law-abiding citizens." *Thompson*, 2025 IL 129965, ¶ 42.

"Illinois's shall-issue licensing regulations are not facially unconstitutional under the second amendment." *Thompson*, 2025 IL 129965, ¶ 46.

¶ 40 The defendant here, like the defendant in *Thompson*, argues that the Firearm Concealed Carry Act is not actually a "shall-issue" regime where the Firearm Concealed Carry Act grants discretion by allowing training officials to judge the applicant's suitability. Specifically, the Firearm Concealed Carry Act, requires a certificate of completion of a firearms training course and a certificate shall not issue if the applicant "handles a firearm in a manner that poses a danger to the student or to others" based on the judgment of the certified instructor. 430 ILCS 66/75(e)(2) (West 2022). *Thompson* considered the argument that the CCL allows the government to deny a license arbitrarily and found that "the *Bruen* Court expressly authorized requirements for training in firearm handling to ensure that the applicant is, in fact, responsible and law-abiding." *Thompson*, 2025 IL 129965, ¶ 48.

¶ 41 The defendant additionally argues that she possessed a FOID card and should not have faced criminal penalties for not undergoing a second and separate process to obtain a CCL in order to exercise her second amendment right to bear arms. Moreover, the defendant argues that the State is unable to meet its burden to prove that there is a historical tradition of requiring that people undergo two sets of licensing processes in order to exercise their second amendment right to carry a ready-to-use handgun for self-defense, outside the home, in Illinois. *Thompson* addressed this issue as well. "The fees and approval process to obtain a CCL comport with the second amendment because they do not require applicants to show an atypical need for armed self-defense and are designed to ensure that only those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Thompson*, 2025 IL 129965, ¶ 50. Furthermore, the "Illinois's licensure

14

regime does not operate like the may-issue regimes declared facially unconstitutional in *Bruen*." *Thompson*, 2025 IL 129965, ¶ 50. We find that there is no basis to invalidate the Firearm Concealed Carry Act or the AUUW under *Bruen*.

¶ 42 We additionally consider the defendant's as-applied challenge to the AUUW and the Firearm Concealed Carry Act. Generally, a defendant must present an as-applied constitutional challenge before the circuit court and develop the record with specific facts and circumstances relevant to his or her claim. *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 57. If the record contains facts and circumstances to decide the defendant's claim, then the issue may be raised and reviewed for the first time on appeal. *Brooks*, 2023 IL App (1st) 200435, ¶ 57. The State does not contend that additional facts are necessary to resolve this claim.

¶ 43 The defendant claims that the CCL requirement under the AUUW to carry loaded firearms in public was unconstitutional as applied to her because she was a law-abiding citizen who carried the firearm for self-defense and believed that she was in legal possession of a firearm because she had a FOID card. The defendant relies on *Bruen* which considered that "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' [citation], and confrontation can surely take place outside the home." *Bruen*, 597 U.S. at 33.

¶ 44 One of the requirements to obtain a CCL is that the applicant must have a FOID card. 430 ILCS 66/25(2) (West 2022). An applicant also faces age restrictions, criminal history restrictions, alcohol and drug restrictions, and completed firearms training and education. See 430 ILCS 66/25 (West 2022). The record does not demonstrate that the defendant had attempted to obtain a CCL or undergo any firearm training or education. She was not aware of the CCL requirements or her rights conferred by a FOID card. "A principle deeply embedded in our system of jurisprudence is that one's ignorance of the law does not excuse unlawful conduct." *People v. Izzo*, 195 Ill. 2d 109,

15

115 (2001). Furthermore, as discussed above, the defendant has not demonstrated the defense of necessity in her use of a firearm. The defendant has not demonstrated that her circumstances presented a unique situation that would have rendered the AUUW or the Firearm Concealed Carry Act unconstitutional.

¶ 45                                    III. CONCLUSION

¶ 46     For the forgoing reasons, we affirm the judgment of the circuit court of Macon County.

¶ 47     Affirmed.

¶ 48     JUSTICE McHANEY, specially concurring:

¶ 49     I agree with the majority that the trial court's decision must be affirmed, because we are bound to follow the decision of our Supreme Court in *Thompson*. I write separately to state my opinion that *Thompson* was wrongly decided, and I agree with Justice Overstreet's better-reasoned analysis in his dissent in that case. Further, while *Thompson* controls, I would find the FOID Card Act unconstitutional based upon the reasons I set forth in my partial dissent in *People v. Wolf*, 2025 IL App (5th) 230520-U, ¶¶ 25-58.